**ADKINS et al. v. HENSON et al.**  (No. 2813.)*

(Court of Civil Appeals of Texas. Texarkana. Nov. 15, 1923. Rehearing Denied Nov. 22, 1923.)

**I. Wills ⊜166(2)—Undue influence held not proved.**

In a will contest, evidence *held* insufficient to sustain a finding that the will was procured by the undue influence of testator's wife in whose favor it was executed.

**2. Wills ⊜55(5)—Evidence held not to show testamentary incapacity.**

Where the question of the alleged testamentary incapacity of a testator depended solely on whether he, a strong man in middle life, suddenly stricken with influenza, ending fatally, was continually irrational and wholly unconscious during the last four days of his sickness, during which the will was executed, evidence *held* insufficient to sustain a refusal to probate the will because of mental incapacity.

Appeal from District Court, Denton County; C. R. Pearman, Judge.

In the matter of the Estate of N. H. Henson, deceased. Will contest by Lucy Belle Adkins and others against Elmer Lee Henson and others. On appeal from order refusing to probate the will the district court refused probate, and defendants appeal. Reversed and remanded.

Sullivan, Speer & Minor, of Denton, Jas. P. Cogdell, of Fort Worth, and H. L. Davis, of McKinney, for appellants.

Thomas, Frank, Milam & Touchstone, of Dallas, and Owsley & Owsley, of Denton, for appellees.

LEVY, J. On October 21, 1918, N. H. Henson duly executed a will. He died October 23, 1918. His surviving wife on December 24, 1918, filed an application to probate the will. At a later time appellees, children of N. H. Henson by a former marriage, filed an application for contest of the will upon the grounds that (1) the testator did not have testamentary capacity to make the will at the time it was executed; and (2) undue influence was used by the wife upon the testator in the execution of the will. From an order of the probate court refusing to probate the will, an appeal to the district court was perfected, and a judgment was there entered refusing to admit the will to probate. In the district court the two special issues were submitted and answered by the jury as follows, viz.:

"First issue. Do you believe from a preponderance of the evidence that on October 21, 1918, that is, at the time of the execution of the will, N. H. Henson had sufficient mental capacity to execute the will in controversy and dispose of his property? Answer of the jury: No.

"Second issue. Do you find from a preponderance of the evidence that Lucy Belle Henson exercised undue influence over the mind of N. H. Henson, and thereby induced him to execute the instrument here offered for probate? Answer of the jury: Yes."

The appellants assign several errors, but the principal contention is that the evidence is too weak and uncertain to sustain the findings against the will. We think the appellants' contention should be sustained. We cannot set forth and analyze in detail, within reasonable limits, all the evidence introduced in the trial, and we shall therefore state our conclusions upon it, particularizing those portions of it only which we think require special notice. The deceased was at the time of his death about 45 years old, and was an industrious farmer who had accumulated valuable property, real and personal. He was admitted to be robust, intelligent, and "a man of strong will, who was always strong to carry his point on anything, his views of business, politics, and religion, or anything of that kind, or any business propositions." He was regarded in the neighborhood as a fair, just, and upright man. He had three sons by his marriage who are now adults, having advantages of an education and the accumulation of some property, and he had three children by the present marriage—two boys and one girl—now 17, 16 and 11 years old respectively. He died Wednesday morning, October 23, 1918, from influenza pneumonia. He contracted "the flu" during the influenza epidemic raging at that period of time, 10 days, probably 11 days, before his death. He was compelled to go to bed sick with influenza 10 days before his death. Pneumonia quickly set in, and he had fever at time ranging from 103 to 104 degrees high, and he was very ill. On Sunday, October 19, about 7 days after he took to his bed, and about 3 days before his death, the testator requested Mr. Staley, his friend, to have Mr. Barnum, a real estate agent, come Monday morning to write his will. Mr. Barnum came about 8:30 o'clock Monday morning to write the will. On that morning, just as Mr. Barnum arrived, the testator requested Mr. Staley "to get Mr. Vandeventer and stay and witness the will, which we both did." After Mr. Barnum came to the home, the testator said aloud "that he did not want any one in the room there but Mr. Barnum and himself, and all would have to retire from the room." In compliance with the request all in the room did retire to the porch or front gallery. The testator then directed Mr. Barnum how to write the will, outlining to him his intentions and manner of bequests. About one hour was occupied in preparing the will. Mr. Barnum testified:

"He was in bed when I arrived. He raised himself up on the bed, and had the pillows fixed so that he would be in a propped up position. Mr. Henson requested the room to be cleared, and then he began talking to me. In a sense I knew something about the kind and class of property owned by him, independent of anything he may have told me at the time. I knew that he owned land and live stock. Mr. Henson dictated the terms of the will, and said the lands were worth $150 per acre. His estimate was approximately correct according to the selling values of land at that time. He enumerated his horses, live stock, etc. I do not remember whether he put an estimate value on them at the time or not. I do not remember about these values. I was acquainted with the reasonable market value of lands of that quality at that time, and Mr. Henson's estimate was correct. He discussed with me his other property, spoke about his farming implements and some Liberty Bonds. I think he mentioned about money. There were bonds and war stamps, but I forget whether there were any notes. I do not know what was said with reference to them, only that they were to go in with the balance of the estate. I wrote into the will the things said by him with reference to a disposition of his property detailed to me by him at the time. I only made one suggestion. I suggested that he give the first wife's children something to make the will legal. He said that he did not want to give them anything, because they had left home early, and he supposed they thought he never would make anything much, and that they wanted to work for themselves. And then it was that I told him he had to grant them something to make the will legal. He said that he wanted to leave his property to his wife as long as she remained his widow, and in case she did not remain a widow he wanted the property to go to their children, the younest set of children; wanted her to have the use of the property to raise these youngest children, as she would need it to raise these minor children. He did not ask my advice as to whether it would be legal to leave the older children out of the estate, but I told him it would not be legal. I advised him that it was customary. He gave the names of the children who should participate in the estate after the death or marriage of the wife. I did not know the names of the children named by him at the time, and I do not know whether he gave me their names correctly. * * * After I had written the will I read it over to him, and he apparently understood the nature and effect of the will, and did not make any suggestions, objections or changes in it. I saw him sign the will in the presence of the witnesses, and in the presence of each other they signed as witnesses."

There is no pretense that the testator did not sign the will, nor that it was not duly executed and attested according to the statutes. In the light of Mr. Barnum's testimony the terms of the will can be considered. As shown above, Mr. Barnum testified:

"I wrote into the will the things said by him with reference to a disposition of his property detailed to me by him at the time. I made only one suggestion."

The will by its terms directs "that the expenses of my last sickness, including the expenses of my funeral, be first paid in full," and then directs that the three older children be paid $1.each. Then further the will recites:

"I give and bequeath to my beloved wife, Lucy Belle Henson, all the remainder of my estate while and as long as she remains my widow, consisting of 305¼ acres of land valued at $150.00 per acre, $3,300.00 Liberty bonds, $200.00 thrift stamps, together with all of my live stock, consisting of about 28 head of sheep, 12 head of cattle, 4 mules, 2 horses, 1 binder, 1 drill, 2 wagons, 1 disk harrow, 1 section harrow, about $600.00 in notes, and all my cash on hand and in bank, all crops on hand and to be gathered for this year of 1918, together with cotton consisting of five bales, all of the household and kitchen furniture now in use in the family residence, for and during her natural life so long as she remains my widow, after which, if she fails to remain my widow, I desire and direct that for the benefit of my three minor children Nicholas, H. Henson, Jr., England Henson, and Stella Mae Henson, now minors, I give and bequeath all of my estate of whatsoever kind, and desire and direct that a guardian shall be appointed for them during their minority. I further desire and direct, in order to avoid any confusion of contention, that there none of the property or land be loaned or rented to either my senior or her senior children, and none of my brothers or my wife's brothers."

[1, 2] It was also shown that, when the testator was stating to Mr. Barnum the terms desired to be inserted in the will concerning his wife, the testator turned towards his wife, who was by his side, holding the pillow that his head rested on, and asked her this question: "Isn't that in accordance with or according to our agreement?" The wife answered: "Yes," and the clause was written in the will as dictated by the testator. The clear inference from these undisputed facts is that the will reflected the real testamentary intent and purpose of the testator, and that he fully knew of, understood, and assented to its terms. And considering further, as we have, all the evidence concerning the mental condition of the testator, there is no such clear proof, we conclude, of his lack of mental capacity to make a will as would justify sustaining the verdict of the jury. The facts go to show a feebleness and exhaustion physically from the disease, but do not reasonably go to show a continual unconscious or irrational state of the testator's mind. At times he would be wandering and unconscious, and at other times rational; but the irresistible conclusion of clear evidence is that all during the time he was dictating and executing his will the testator was rational and mentally competent to attend to business. An affirmative sufficient fact showing that the testator was not rational and mentally competent during the time he was executing the will is not evi-

dence in the record. Some witnesses undertake to state their opinion concerning his general condition, but it is only an opinion. The delusions and wanderings of mind at times are reasonably explained, and are not significant enough of lack of full mental capacity to give them great weight in this case. The present case differs from the run of cases usually appearing in the books. The incapacity relied on in this case is not claimed to be due to insanity, or senility, or long years of sickness. The incapacity, if any, must rest solely on whether or not the testator, a strong man in middle life stricken with influenza, was continually irrational and wholly unconscious during his last 4 days of sickness. The evidence is too weak to uphold the conclusion that on Monday, when the will was executed, the testator was irrational and not mentally capacitated to make a will. We also conclude that the evidence is too weak to uphold the verdict of undue influence.

The judgment is reversed, and the cause remanded.