LORD et al. v. HATCHER et al.

No. 10151.

Court of Civil Appeals of Texas. Galveston.
Feb. 2, 1935.

Rehearing Denied April 11, 1935.

Kahn & Branch and E. H. Cavin, all of Houston, for appellants.

Fulbright, Crooker & Freeman, of Houston, for appellees.

GRAVES, Justice.

This appeal is from a judgment refusing the probate of a purported will of Mary Jane Lord executed by mark on June 6, 1923, prior to her death on August 19, 1926, entered pursuant to a jury's verdict to the effect that she did not have testamentary capacity at the time she so signed the instrument; in the paper so discarded she had recited that all of her property should go to her four sons, Leonard, John, William, and Homer Lord, and to her grandson, Raymond Lord, no part of her estate being left therein to any of her daughters, of whom she had six living at the time of her death and one deceased.

The appellees in their brief object to all the assignments and propositions of appellants that seek to challenge in this court the sufficiency of the evidence to sustain the jury's finding and the consequent judgment on the question of testamentary capacity, on the ground that they are mere abstractions, hence present nothing of substance for review; a number of them undoubtedly are of that character, but this court is of opinion that at least one of them does sufficiently raise that issue to entitle it to consideration.

As a preliminary to a more direct consideration of that dominating inquiry, certain undisputed facts, tending by reflection at least to throw some light upon it, may be thus referred to:

At the time of executing the alleged will and of her death, the aged lady's property consisted mainly if not exclusively of an undivided one-half interest in a farm near Crosby in Harris county, where the family had originally settled on coming to Texas; the other undivided one-half interest therein belonging even up to the trial of this cause to all of her children (sons and daughters alike) as heirs of their previously deceased father, Nephi Lord, who years before had died intestate and whose estate had never been partitioned, none of the daughters (appellees here) ever having received anything out of it. The six daughters were all married, living wherever in different states the avocations of their husbands placed them, Mrs. Hatcher being the only one living in Texas. One of the sons, John Lord, left this home place in 1900, thereafter living in California and Oklahoma, never having returned to or done any work on the old farm, while the sons Homer, Willie, and the grandson, Raymond Lord, after the death of Nephi and during at least the years of 1917, 1918, and 1919, resided and worked on the old farm and "lived on what was raised on the farm." The proffered will had been executed on June 6, 1923, by Mrs. Lord in the office of Mr. Kahn, counsel for appellants herein, by Mr. Kahn's touching her pen for her while she made her mark, she being then still a resident on the farm. In 1924, about a year and a half thereafter, she and her son Leonard Lord moved to the town of Crosby, where she continued residing until the time of her death, having been 75 years old when the paper was executed and 78 when she died. For several years prior to her death she had been in feeble and infirm condition physically at least and later mentally as well, which general condition gradually appeared to have grown worse, until there appears to be no dispute in the testimony to the effect she had become of unsound mind at the time of her death and for some time prior there-

to; the debate occurring over how long prior to her death that condition had existed, the appellants contending that it had not been so three years back when she had so made the proffered will, while the appellees maintained and the jury found that she had at that time lost all testamentary capacity. Apparently Mrs. Lord always had been, and up until her death remained, devoted to all of her daughters, speaking lovingly about each of them, although during her last several years she had lived only with her sons—with at least two of them in the old home up to the time she left the farm, and thereafter with one.

While appellants made no objection to the submission of the issue as to testamentary capacity on the ground of insufficient evidence, they do very earnestly contend here that the verdict of the jury thereon was so against the great weight and preponderance of the evidence as to be clearly wrong. This court, however, after a painstaking examination of this bulky statement of facts, is unable to agree with them, concluding rather that, while there was much testimony both pro and con, there was only such conflict in it upon that ultimate issue of fact as the jury alone were authorized to resolve. It is true there were in number more of these witnesses for the contestees than for the contestants, but the weight of the evidence as an entirety does not necessarily dip upon the side of the greater number of witnesses, even though there be a cloud of them, but upon that of those exhibiting the more intimate and competent knowledge of the testator's mental condition at the time involved, and therefore speaking with the greater probative value.

With this consideration in mind, one of the features standing out of all the testimony in this instance with compelling force, it seems to us, is this: No one of the witnesses for the contestees was shown to have been actually well acquainted with Mary Jane Lord at or up to the time this paper was so drawn for and executed by her through making her mark in place of being able to sign her name, and who had had a really fair opportunity to pass upon her mental condition at that time as compared with it in previous years; while upon the adverse side those presented by the contestants were the very few who had sustained the closest relations and enjoyed the most intimate acquaintance with her over those periods of time, thereby placing them in much the better position to judge

as to her capacity to make a will at the very time she undertook to do so. Another outstanding feature is the testimony of her grandson, the contestee, Raymond Lord, who was called by the appellees, and who was personally interested in the upholding of the will under which he was given a one-fifth share of the estate along with a like share each to his uncles, to the apparent effect that his grandmother was of unsound mind as late as one year prior to her death; that testimony being, with the inquiry relating to her condition a year before her death:

"Q. What was in her conversation that was so different from what it used to be? A. Probably if you asked her anything she would not answer it at all.

"Q. From that would you say she was of unsound mind at that time? A. At that time I expect she was."

Raymond's referred to interest in seeing the instrument involved upheld as a will—perhaps as great or greater than that of any of the other contestees—and which reasonably may have made him loath to concede the existence of any such mental unsoundness on the part of his grandmother as might tend the other way, is that he would get nothing out of the estate unless this paper were so upheld as a will, whereas all the other contestees would still share in the joint estate of both father and mother according to the law of descent and distribution. Despite being thus alone affected and isolated by these circumstances from the other contestees, the young man further testified that his grandmother had been in a feeble condition when she broke her arm in September of 1922, and that the change he had noted in her mental condition had not come up suddenly but began gradually and grew worse; that he had not seen her every month but sometimes would not for two or three months. Having thus, notwithstanding the natural inclination his position might have given him toward leaning in favor of his grandmother's capacity to make a will in 1923, in effect admitted that she did not have it as soon as two years thereafter, taking all the other circumstances tending that way, it was not an unreasonable inference for the jury to conclude that her mind had already become so unsound in June of 1923.

As indicated supra, none of appellants' other testimony, such as that given by their witnesses Barlow, Mathis, Kahn, Hare, Mrs. Lynch, Reidland, Garber, and Mrs. Sandy, reflected such acquaintance with

and advantageous position for observing and knowing of the deterioration of the mental condition of Mrs. Lord in the last several years of her life as did that of witnesses for the contestants, to wit: Mrs. Johnson, a good friend of the family who visited her once a month for several years prior to her death; Mrs. Wofford, stepmother of Ida and Irvin Wofford, two of Mrs. Lord's grandchildren; and Clarence Hatcher, her grandson, who saw her on an average of twice a week from 1921 until she died.

The witness Barlow, introduced as a physician, after testifying that he had many years before been awarded a medical degree by a university in Bombay, India, admitted that he had never tried to practice as such, nor had even taken a course in mental diseases while in school, and that he was not qualified to express an opinion as an expert touching the mental condition of a patient; then testifying further as a layman he stated he had "treated" Mrs. Lord one time after she was injured by falling and wrenching her wrist but could not see that the arm was broken, being unable to remember whether he had waited on her twice that week or not, and adding that she, on that occasion, had carried on a conversation with him like any one else would have done.

Mr. Mathis, who was a law partner of Mr. Kahn at the time the latter drew the alleged will and aided Mrs. Lord in so executing it while he touched her pen for her, disclosed that he had had very little opportunity at that time to know or pass upon Mrs. Lord's mentality; he said he saw her on that occasion only five or ten minutes, not exceeding ten, and merely witnessed the will, adding his recollection to be that Mr. Kahn had asked Mrs. Lord: "What are you going to do with the other children?" To which she replied: "They would get or have gotten their share of their father's estate and these children looked after her and had taken care of her and she wanted them to have her part of the property." Aside from this recital of what passed between Mrs. Lord and Mr. Kahn, obviously Mr. Mathis' momentary observation of her did not qualify him to pass with any matured judgment upon her testamentary capacity at that time.

Mr. Hare's expressed opinion about her mental condition that he "always considered the woman of sound mind" is well-nigh undermined by his further testimony to the effect that he had never known nor

seen her until after she and her son Leonard—with whom he long had carried on business relations—had moved to Crosby, which was some time after the purported will had been executed.

Mr. Reidland's testimony was similarly much weakened by his stating that he could not say anything about Mrs. Lord's mental condition during the year 1923; that is, his testimony is that he saw her come to the grocery store with her son Leonard Lord during the years 1921 and 1922, but that he was unable to give any definite testimony with reference to the very year that the will declared upon was executed.

Mr. Kahn himself, while testifying fully as to the circumstances under which he dictated and aided Mrs. Lord in so affixing her mark to this paper—including his opinion that she was then of sound mind—disclosed that he had altogether only met her some three or four times, never having had any intimate dealings or acquaintance with or knowledge of her, saying he first met her when she was brought to his office by her husband twice during the latter's lifetime, that once more, two or three years after his death in 1914, she was brought there by some of her sons, and at her request he prepared a will for her; that again in 1923, she was brought there either by Leonard, Willie, or Raymond Lord, whereupon he dictated and helped her execute the instrument here now involved. This same lack of continued acquaintance, knowledge, and intimate dealings also obtained with reference to Mrs. Sisson, Mrs. Lynch, and Mrs. Sandy.

Mrs. Sisson, the stenographer in Mr. Kahn's office to whom he dictated this paper in 1923, is not shown to have ever seen or known anything about Mrs. Lord's mental condition except from what happened upon that occasion.

Mrs. Lynch, who said she was a good friend of Mr. Barlow and was with him on the occasion when Mrs. Lord broke her arm, does not appear to have ever sustained any other close relations with Mrs. Lord, testifying that she did not know how many years it had been prior to that time when she had seen the old lady before—conceding that it might have been several years.

Mrs. Sandy testified that during the year 1922 she would see Mrs. Lord "once in a while"; that she also saw her occasionally in 1923; that during all the time she knew her she considered her of sound mind.

The witness Garber's testimony was so weakened by contradictions as to when and under what conditions he worked upon the Lord farm and observed and had dealings with Mrs. Lord, that the jury were probably at a loss to appraise just what his opportunities had been, although he, like the others of contestees' witnesses, undertook to state that Mrs. Lord was of sound mind.

It should be interpolated, perhaps, that Mrs. Sisson, similarly to Mr. Mathis, though to somewhat different purport, testified that while dictating this alleged will to her Mr. Kahn had inquired of Mrs. Lord whether she had any other children, and she said she did and that they would take their father's part; that the father had died and the other children would take that part and she wanted her boys to have her part of the estate.

In view of the undisputed showing otherwise supra, it undisputedly appears that in thus assigning in the presence of the witnesses Mathis and Mrs. Sisson this reason for her unusual if not strange action in undertaking to disinherit all of her daughters in favor of her sons, Mrs. Lord was acting upon something entirely incorrect in fact; in all the circumstances otherwise attending, the jury might not unreasonably have considered her making the declaration these witnesses thus testified to hearing itself an indication of unsound mind.

Upon the other hand, the above-mentioned witnesses and others for the contestants all gave it as their definite opinion that Mrs. Lord was of unsound mind prior to, during, and after the execution of this paper, after having detailed acts and conduct upon her part during the period specified that were strange, abnormal, and reasonably appeared to be the result of an impaired mentality—basing their opinions upon close, long-continued, and intimate knowledge of and contacts with her.

Only a brief résumé of outstanding features will be made from some of this testimony:

(1) Dr. Tadlock, a practicing physician for over thirty years in that vicinity, was called by Mrs. Hatcher in October of 1922, not to make an examination as to her mother's mentality, but to give proper medical attention to a broken arm the latter had received some time before. The doctor testified to having accordingly examined Mrs. Lord at that time, finding her in a run-down and very feeble condition, having a previously broken arm that was not in alignment and was giving her trouble; that the arm did not have a splint on it, and because of her age and run-down condition he did not consider it advisable to have the arm broken over again, adding that because of her greatly emaciated and weakened condition he could only suggest at that time a tonic to increase her appetite and try to build her up; he then said he made no examination nor observation touching her mental condition; but added that during his visit there Mrs. Lord did not say anything to him at all. Answering further a direct question as to whether or not in his expert opinion such a physical condition as he had so found Mrs. Lord to be in at that time would affect her mentality, he replied: "I would say a weakened condition will affect the mind as well as the body."

(2) Clarence Hatcher, Mrs. Lord's adult grandson, and whose acquaintance with her was perhaps more intimate than that of any of the contestees' witnesses, he having seen and been with her frequently between the years 1920 to 1926, testified that he first noticed a change taking place in her mental condition when she began ignoring him and his brother and failing to either notice or talk to them; that they would ask her questions and she would not answer, always seeming to act as if looking for something she could not find, and if asked what she was hunting she wouldn't reply but continue feeling around on the table or anywhere she happened to be; that she was habitually so feeling around, and when he and the others would inquire what she was looking for she would not reply but continue this strange action; that during this time when he and his mother visited her they found she had cut the toes of several chickens off even with their feet, and although admitting having done it she would give no reason therefor; that at another time they found her 200 yards behind the house trying to cut weeds with a hoe too heavy for her to handle, and when asked what she was doing out there cutting the weeds she answered she was afraid of snakes coming around the house, when in fact worse weeds were growing right around the house itself, which she did not mind at all, objecting only to those 200 yards away which were in the pasture she had no occasion to even go into; when her attention was called to that, she would simply say, "Yes"; that the cutting of the chickens' feet occurred before she broke her arm;

that during all this period she would unaccountably want to prepare supper meals at 3 o'clock in the afternoon instead of at the usual time of 6 o'clock; that ofttimes she would start talking by saying "no" or "yes," and then would continue saying the same thing in each instance throughout the conversation; that she turned on a water hydrant at the back porch without any occasion for doing so and let it run until the water accumulated an inch deep, and when questioned about it would simply say, "Yes"; that following the injury to her arm in 1922 it seemed like her mind would wander away and she did not know what she was doing half the time, and would merely say "yes, yes" or "no, no" when asked anything, making no further response; that in his opinion she was of unsound mind in the fall of 1922 when she broke her arm; that thereafter her mental condition grew worse; that he thought her of unsound mind during the month of June of 1923, having seen her an average of twice a week during that period.

(3) Mrs. T. S. Johnson testified to having known Mrs. Lord intimately during the last twelve years of her lifetime, having visited her on an average of at least once a month while she lived on the old farm and also after she moved to Crosby; that during her last several years, including 1923, Mrs. Lord could not hold a conversation, would habitually go to the dresser and unaccountably fumble around like she was looking for something; that she would fail to recognize the witness and also her own daughter Mrs. Hatcher, and that she inquired on several occasions who they were; that she gradually grew worse during 1921, and that on one occasion when she and Mrs. Hatcher visited her they found Mrs. Lord to have sustained an injury to her arm and head and that Mrs. Lord did not talk to them on that occasion; that she frequently wanted to have supper prepared at 3 o'clock in the afternoon instead of the usual hour; and that she saw the chickens with their feet cut off.

(4) Mrs. D. W. Wofford, stepmother of Mrs. Lord's grandchildren Irvin and Ida Wofford, testified that she had been acquainted with Mrs. Lord for over twenty-five years, and that having had occasion to closely observe her for about two hours during April of 1923, she was certain, in her own opinion, that Mrs. Lord was then of unsound mind. She thus described her: "She did not converse in our conversation and the expression on her face, her eyes,

I could not drag her into a conversation, if I asked her a question or talked to her in any way I could not get any facts, she would not talk with me with any sense at all. * * * Her eyes were expressionless."

■ It seems plain that in this state of the record, the power of this court to set aside a jury's verdict where the great weight and preponderance of the credible evidence is so against it as to make it clearly wrong never came into being in this instance. The verdict here therefore may not be disturbed. Cavanaugh v. Cavanaugh (Tex. Civ. App.) 238 S. W. 1019; Bradshaw v. Brown (Tex. Civ. App.) 218 S. W. 1071; Dalton v. Dalton (Tex. Civ. App.) 233 S. W. 546.

■ The appellees, as indicated supra, make strenuous objection to the consideration by this court of any of appellants' remaining propositions, on the ground that they are mere abstractions under such authorities as rule 30 for the Courts of Civil Appeals, Wingart v. Baxter (Tex. Civ. App.) 30 S.W.(2d) 522; Gulf, C. & S. F. Ry. Co. v. Tarver, Steele & Co. (Tex. Civ. App.) 295 S. W. 320; Ferguson v. Conklin, (Tex. Civ. App.) 51 S.W.(2d) 622; State Teachers' Mut. Life Ins. Co. v. Mims (Tex. Civ. App.) 74 S.W.(2d) 549, and we conclude that all of them so offend, with the possible exception of Nos. 9 and 15, which in any event, it is thought, point out no reversible error in the circumstances existing.

It follows from these conclusions that the judgment should be affirmed, and it has been so ordered.

Affirmed.

PLEASANTS, Chief Justice (dissenting on rehearing).

I am unable to agree with my associates in the holding that appellants' motion for rehearing should be refused.

When this appeal was originally decided by this court, I expressed to my associates my serious doubts of the soundness of their conclusion that the judgment of the trial court should be affirmed, but did not then enter my dissent.

Further investigation and reflection has convinced me that the judgment of the trial court cannot be affirmed without disregarding well-settled rules of decision by the courts of this state which illustrate and emphasize the power and duty of our

courts in cases of this kind to protect the old, feeble, and distressed in mind and body, in the invaluable right which the law gives them to dispose of their property as they deem most conducive to their happiness and comfort. This conclusion constrains me to enter my dissent, the grounds of which will be stated as briefly as I may consistent with clarity.

The opinion of the majority of the court, written in the usual fluent and attractive style of its author, is an entertaining essay upon the issues discussed and the incidents of the trial, but is not an enlightening discussion of the questions of law and fact presented by the record, nor a convincing decision of the vital questions raised by appellants' brief.

The majority of the court having concluded that the judgment should be affirmed, the question of whether the verdict of the jury finding that Mrs. Lord did not have testamentary capacity at the time she executed the will in question is so against the great weight and preponderance of the evidence that it should not be permitted to stand, is a question of fact which our Supreme Court has no jurisdiction to determine. But I cannot refrain from entering my earnest protest against the holding of the majority that the verdict upon which the judgment in the case is based should, upon the evidence disclosed by this record, be upheld. This holding is in direct conflict with the numerous cases from this and other Courts of Appeals cited in appellants' brief, and tends to greatly lessen, and in a large measure destroy, the power of our courts to protect owners of property in their right to make such testamentary disposition thereof among their children or heirs as they may deem fair and just, and leaves such right subservient to the judgment of a jury as to how the jury may conclude the property should be distributed by the testator. In re Bartels' Estate (Tex. Civ. App.) 164 S. W. 859; Milner v. Sims (Tex. Civ. App.) 171 S. W. 784; Navarro v. Garcia (Tex. Civ. App.) 172 S. W. 723; Vaughan v. Malone (Tex. Civ. App.) 211 S. W. 292; Hill v. Crow (Tex. Civ. App.) 241 S. W. 184; Stolle v. Kanetzky (Tex. Civ. App.) 220 S. W. 557; Id. (Tex. Civ. App.) 238 S. W. 724; Id. (Tex. Civ. App.) 259 S. W. 657; Adkins v. Henson (Tex. Civ. App.) 256 S. W. 967; Hodges v. French (Tex. Civ. App.) 256 S. W. 662; McGee v. Searcy (Tex. Civ. App.) 258 S. W. 195; Bagwell v. Shanks (Tex. Civ. App.) 260 S. W. 222; Whitney v. Murrie (Tex. Civ. App.) 264 S. W. 270.

The will of Mrs. Lord was executed on June 6, 1923. The testatrix died on August 19, 1926, and the will was duly probated by the county court of Harris county on December 13, 1926. Within the four years allowed for such proceedings, contestants instituted this suit to set aside the probate of the will and to contest its probate. The hearing on this suit in the county court was had in 1931, and the contest was finally decided in the court below in favor of contestants in 1933.

Mr. H. E. Kahn, a prominent lawyer of Houston who wrote and witnessed the execution of the will, testified, in substance, that he had known Mrs. Lord since about 1910, she having come to his office several times with her husband, Nephi Lord, who was one of his clients; that in 1916, after the death of Mr. Lord, he wrote a will for Mrs. Lord in which she devised all of her interest in the community estate of her deceased husband and herself to her sons and grandsons, who are the beneficiaries named in the will involved in this contest. On June 6, 1923, Mrs. Lord again came to witness' office from her home in the country and told him that the will he had previously written for her had been lost or destroyed or had become misplaced, and she desired him to prepare another one for her. "On the last occasion when Mrs. Lord came to my office I talked to her quite a while discussing her former will and what became of it and as I have detailed I also asked her whether or not she had any desire to change her bequests and she said 'no,' and gave me as a reason that her husband died in 1914, that they had bought a piece of land, a section of land, six hundred and forty acres, located near Crosby, as the testimony has disclosed, and from an original deed conveying the property to Nephi Lord, he agreed among other considerations to pay off Twelve Hundred Forty-two ($1242.00) Dollars, which is still due the State, as purchase money on this land, that the money had not been paid to the State at the time of the death of Nephi Lord and had not been paid at the time she was in my office in 1923, and she stated to me that after the death of her husband, Leonard, Willie, and the other boys mentioned in the will, had taken care of the place and taken care of her and paid the State

the interest every year due on this indebtedness and also had paid the taxes, and for that reason she thought these boys that are mentioned in the will should be the beneficiaries of her part of this land. * * * She said the old man died without a will and that his part, his half interest in this land would go to all the children. I asked her about Raymond Lord, her grandson, and she told me that Mrs. James, the mother of this child, was married to a man by the name of Cash and they lived together seventy-two days and separated previous to the divorce and she returned home to her mother, and she was pregnant at the time, and in due course Raymond Cash or Lord, who took the name of Lord, was born and made his home on the farm and she practically raised Raymond and thought as much of him as any of the children and having been around her place she considered, or told me that she would give Raymond an equal part with the other four boys that she had mentioned. After discussing all the facts with her, I called in my stenographer, Miss Myrtle Hamilton, now Mrs. Sisson, and dictated the will, and in the course of dictation I would ask Mrs. Lord about her disposition of the property. After dictating the will Miss Myrtle went out to write it up on the typewriter and brought it in and whether John Mathis came in or I sent for him to witness the will, I don't know, you will observe the will is attested to by two witnesses, John Mathis, and myself, and is signed by Mrs. Lord's mark, who never could read and write, and I held the pen and she put her hand on it and Miss Myrtle witnessed the will, as evidenced by the will itself. From my knowledge of Mrs. Lord, and from my conversation with her at the time of the execution of the last will, from her conduct and appearance, I say she was of sound mind at the time. It is my opinion that she was of sound mind when she executed the will offered in evidence in this case."

Mr. John Mathis, who had formerly been a law partner of Mr. Kahn, testified: "That he was present in the office when Mrs. Mary Jane Lord executed the will; that he heard the conversation between Mary Jane Lord and Mr. Kahn although he (Mathis) did not talk to her. That Mr. Kahn asked Mrs. Mary Jane Lord—What are you going to do with the other children? and she replied—That they would get or had gotten their share of their father's estate, and that these children (meaning the beneficiaries in the will) had looked after her and taken care of her and she wanted them to have her part of the property. That there was nothing unusual in her demeanor; that she was a little woman, probably 65 or 70 years old, and that she talked rationally. That she appeared to be of sound mind."

Mrs. Myrtle Sisson, the stenographer to whom Mr. Kahn dictated the will, and who copied it on a typewriter, testified that she was in Mr. Kahn's office and heard the conversation between him and Mrs. Lord, in which she stated her reasons for devising all of her interest in the property to her sons and grandsons. "She said they had stayed on the place and taken care of her since their father's death and paid the taxes and taken care of it and she wanted them to have her part of it, so far as she was concerned she wanted them to have it. * * * You asked her if she had any other children and she said that she did and they would take their father's part, that the father had died and the other children would take that part and she wanted her boys to have her part of the estate." This witness further testified that from Mrs. Lord's conversation and demeanor at the time this will was executed, "she was of sound mind, she was perfectly calm and considerate."

The signing of the will by the testatrix and the attesting witnesses was in full compliance with the requirements of our statute.

This positive testimony of all the witnesses who were shown to have seen or talked to Mrs. Lord on the day the will was executed fully establishes prima facie her testamentary capacity at the time she executed the will. The test of such capacity does not require that the testator be wholly free from mental weakness or infirmity, nor from occasional hallucinations or mental lapses, but only requires that at the time the will is executed he has sufficient mental capacity to understand that he is making his will, to know the nature and extent of his property, and the objects of his bounty, and to fully understand the disposition made of the property by the will. All these requirements are fully shown by this testimony. Salinas v. Garcia et al. (Tex. Civ. App.) 135 S. W. 588, 591.

The only testimony adduced by appellees in support of their contention that Mrs. Lord did not at the time this will

was executed have sufficient mental capacity to make testamentary disposition of her property goes no further than to show acts and demeanor of hers on various occasions prior and subsequent to the execution of the will, which, in the opinion of nonexpert witnesses, indicated that her mind was not sound. None of these exhibitions of mental unsoundness occurred in close proximity, in time, to the date on which the will was executed. ·

The opinion of the majority erroneously gives to a quoted portion of the testimony of Raymond Lord, the grandson of the testatrix, a beneficiary of the will and one of the appellants in this case a meaning in direct conflict with his testimony when considered as a whole. The quotation in the majority opinion from the testimony of this witness gives no indication of the time referred to by the witness when he states he thought or expected Mrs. Lord was of unsound mind. Other portions of his testimony, however, conclusively fix this time. In answer to a direct question as to when he first observed her failing mental condition, the witness testified: ·

"Q. During the time you were around did you notice she was in a feeble condition when she broke her arm? A. She was feeble of course and getting old.

"Q. You also noticed about that time her mentality was not as sound as it previously was? A. No, sir, I did not think so.

"Q. When did you notice that? A. I did not notice her in that condition until a year before she died (August 19, 1926).

"Q. In 1922 and 1923 you did not notice it? A. No sir, I did not."

This testimony of the grandson, who lived in the home of his grandmother during all of his infancy and boyhood, and who saw her more frequently, from the time her arm was broken in 1922 until she moved to Crosby in 1924, than any other witness, fully corroborates the testimony of Mr. Kahn, Mr. Mathis and Mrs. Sisson, as to the mental capacity of Mrs. Lord at the time the will was executed.

In my opinion there is no testimony in this record of sufficient probative force to raise an issue of Mrs. Lord's testamentary capacity, at the time the will was executed, under the tests prescribed by our law. There is no evidence of undue influence exerted by any of the appellants in procuring the execution of the will, and appellees did not request the submission of such issue.

This being the state of the record, I think the judgment of the trial court should be reversed and judgment here rendered in favor of appellants. If this conclusion is unsound, the case should be reversed and remanded because of the ruling of the court in excluding from the consideration of the jury the statements of the witnesses Kahn, Mathis, and Mrs. Sisson, that there was nothing in the demeanor or conversation of Mrs. Lord that indicated there was anything wrong with her mind. Each of these witnesses testified that from Mrs. Lord's conversation and conduct at the time the will was executed she was, in the opinion of the witness of sound mind. If it can be held that there is any evidence sufficient to raise the issue of testamentary capacity, the appellants were entitled to have these stricken statements of the witnesses considered by the jury. These excluded statements, it seems to me, strengthen and emphasize the conclusions of the witnesses as· to the mental capacity of the testatrix, and in view of the preponderance of the evidence against the verdict, it cannot be said their exclusion from the consideration of the jury was not harmful to appellants.